## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JOE MARTIN BRAVO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-01596-K |
| | § | |
| DALLAS INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Dallas Independent School District's ("Dallas ISD" or "the District") Motion for Summary Judgment on Plaintiff's First Amended Complaint (the "Motion for Summary Judgment"), Brief and Sealed and Unsealed Appendices in Support (Doc. No. 49-52), Plaintiff Joe Martin Bravo's ("Mr. Bravo") Response to Defendant's Motion for Summary Judgment (the "Response"), Brief and Sealed and Unsealed Appendices in Support (Doc. No. 57-60); and Defendant's Reply in Support of its Motion for Summary Judgment (the "Reply")(Doc. No. 68), in addition to Plaintiff's Objections to Defendant's Summary Judgment Evidence ("Mr. Bravo's Objections")(Doc. No. 61), and Defendant's Response (Doc. No. 65); and Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence and Appendix in Support ("Dallas ISD's Objections" and "Motion to Strike")(Doc. Nos. 66, 67), and the Plaintiff's Response (Doc. No. 71). The Motions

1

have been fully briefed and are ripe to decide.

After careful consideration of the Motion for Summary Judgment, the Parties' briefs, the applicable law and the summary judgment record before the Court, the Court finds that Mr. Bravo has failed to establish a genuine dispute of material fact for all required elements of a *prima facie* claim of disparate treatment under Title VII of the Civil Rights Act of 1964. Accordingly, Dallas ISD's Motion for Summary Judgment is GRANTED. Dallas ISD's and Mr. Bravo's Objections are both OVERRULED, and Dallas ISD's Motion to Strike is DISMISSED as moot. A final judgment will enter separately.

## I.    BACKGROUND

In this action, Mr. Bravo brings a complaint of disparate treatment by his employer, Dallas ISD, which he asserts is unlawful employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. § 2000e-2.

Mr. Bravo is a middle-aged Hispanic American of Mexican descent, who grew up speaking Spanish in a large working-class family, to parents who worked as migrant farmers and, as a child, Mr. Bravo "was proudly immersed in the traditions of his Mexican heritage." Doc. No. 60-1 at 5, ¶2. After serving in the military and working in several Fortune 500 corporate roles, Mr. Bravo "felt the call of teaching" and viewed himself as "uniquely positioned to help disadvantaged students given his background." *Id.* at ¶3.

Accordingly, in 2015, to "reach out to young people," Mr. Bravo began a career as a middle school teacher with the Dallas ISD. *Id.* Mr. Bravo was assigned to teach career and technical education courses at the Quintanilla Middle School, to students who were predominantly of Hispanic ethnicity, just like Mr. Bravo. *See Id.* at 5-6, ¶¶3-5; *see also* Doc. No. 58 at 12. In the nearly seven years which followed, Mr. Bravo's tenure as a teacher was uneventful, he received favorable evaluations and state ratings, and each year, his teaching contract was annually renewed. Doc. No. 60-1 at 6, ¶¶6-7.

On Friday, April 8, 2022, Mr. Bravo's career trajectory as a teacher changed abruptly, when some of his students accused him of making inappropriate statements about their future educational and career prospects, which they asserted, were racially and culturally insensitive, hurtful and demoralizing.

The accusations against Mr. Bravo were first brought to the school's attention by a student who shared her concerns with Mr. Minor, her teacher in another class, and a second student who was present and corroborated the first student's statements to Mr. Minor. Doc. No. 51-1 at 2-3, ¶¶5,6. Mr. Minor believed his students, so he brought them to speak with the school's Assistant Principal, Mr. Ceballos. *Id.* at ¶¶7-9. After speaking separately with the two students, Mr. Ceballos had the students provide written statements. Doc. No. 51-5 at 2-3, ¶¶3-11. Mr. Ceballos then communicated with the school's Principal, Ms. Ward, who directed him to conduct further investigation. *Id.* at ¶12. Mr. Ceballos then spoke with ten to twenty students from Mr. Bravo's classes, and in individual conversations, found four who raised similar

3

concerns about Mr. Bravo. *Id*. at 4, ¶¶13-16. Mr. Bravo asked those students to provide written statements. *Id*. Since Mr. Ceballos believed the students' statements were credible, he shared the statements with Ms. Ward. *Id*. at 4-5, ¶¶17-18.

After reviewing all the students' statements, Principal Ms. Ward and Assistant Principal Mr. Willis met with Mr. Bravo. Doc. No. 51-6 at 4-5, ¶¶13-14. The Parties offer differing interpretations of what happened in that meeting. Mr. Bravo asserts that he denied to Ms. Ward that he made any inappropriate statements and explained that he "mentioned that the demographic data for the [Quintanilla] campus showed the student population faced challenges that we should strive to help them overcome." Doc. No. 60-1 at 7-8, ¶¶12-14.

On the other hand, Ms. Ward asserts in this conversation, Mr. Bravo spoke negatively about his students' prospects, which she interpreted as corroborating the general nature of the students' report about Mr. Bravo's alleged statements, and his reference to statistics, as his attempt to justify his alleged statements. Doc. No. 51-6 at 5-6, ¶¶15-18. Mr. Willis also concluded Mr. Bravo's justification based on statistics did not excuse the inappropriate comments Mr. Bravo reportedly had made. Doc. No. 51-7 at 3, ¶¶6-7.

After Ms. Ward and Mr. Willis's met with Mr. Bravo, Mr. Ceballos prepared a Critical Incident Report, which was submitted to the Dallas ISD's Professional Standards Office ("PSO"), and Mr. Ceballos also made a report to State of Texas' Child Protective Services ("CPS"), both in accordance with District policy. Doc. No. 51-5 at

5-6, ¶¶20-22.  On April 11, 2022, PSO staff reviewed the Critical Incident Report, and determined that since the allegations suggested a violation of policy, the District must complete a formal Administrators Investigation.    Doc. No. 51-4 at 2, ¶¶3-6. Consequently, the PSO staff directed Ms. Ward to complete an Administrator's Investigation, provided instructions, checklists, and forms to guide her.  Doc. No. 51-4 at 5-6, ¶17.  Separately, Dallas ISD's Employee Relations placed Mr. Bravo on paid administrative leave pending the outcome of the formal investigation. *Id.*  As part of the investigation, on April 12, 2022, the PSO contacted Mr. Bravo to obtain Mr. Bravo's written statement, which Mr. Bravo provided, which the PSO sent to Ms. Ward on April 17, 2022.  *Id.* at 6-7, ¶¶20-22.

On April 19, 2022, Ms. Ward reviewed Mr. Bravo's written statement, and based on his statement, their earlier conversation, review of the students' statements, and after clarifying with Mr. Ceballos the circumstances in which the statements were obtained, Ms. Ward determined the six students' statements were credible.  Doc. No. 51-6 at 11-12, ¶¶32-38.  Further, Ms. Ward concluded that Mr. Bravo violated the Educators' Code of Ethics, Standard 3.2, as set by Dallas ISD's Board Policy, which prohibits "intentionally, knowingly, or recklessly treating a student in a manner that adversely affects or endangers the learning, physical health, mental health, or safety of the student or minor."  *Id.* at 12-13, ¶¶37-38.  Ms. Ward then submitted the Administrator's Investigation to the District, which then requested that Ms. Ward

5

prepare a recommendation regarding what action Dallas ISD should take concerning Mr. Bravo's employment given the results of the investigation. *Id.* at 14, ¶41.

On May 10, 2022, Ms. Ward submitted a recommendation to the Legal Review Committee ("LRC") that Mr. Bravo's contract be non-renewed. *Id.,* ¶42.  In the recommendation, Ms. Ward summarized her investigation, concluded the statements Mr. Bravo reportedly had made "aligned with the comments he made to me" and concluded that Mr. Bravo's statements had harmed the students. *Id.* at 15, ¶43.  Ms. Ward further reported to the LRC that Mr. Bravo's "statement indicated to me that he did not care to understand the seriousness of his remarks" and concluded that, since this "does not appear to be something he is willing to fix," Ms. Ward "felt the best course of action [would be] to non-renew the teacher."  Doc. No. 51-3 at 22.

On May 25, 2022, the LRC met to consider the six students' statements, the investigative report which concluded the students' accusations were credible, and Ms. Ward's recommendation to non-renew Mr. Bravo's contract.  Doc. No. 51-2 at 15, ¶43.  After independently reviewing the information, the LRC voted unanimously to recommend Mr. Bravo's employment be terminated for good cause, since the LRC concluded that Mr. Bravo's conduct violated Dallas ISD's policies. *Id.* at 15-18, ¶¶44-51.

Accordingly, on May 25, 2022, Mr. Bravo was informed by telephone the LRC would be recommending his termination to the Board and provided him the opportunity to resign in lieu of termination.  *Id.* at 20-21, ¶56. On May 26, 2022,

Dallas ISD reported Mr. Bravo to the State Board of Educator Certification. *Id.* at ¶57. On May 27, 2022, Dallas ISD sent Mr. Bravo a letter to inform him the investigation had been completed and had determined that he had violated of Standard 3.2 of the Educator's Code of Ethics. Doc. No. 51-4 at 90.

On May 30, 2022, Mr. Bravo filed a Level I Grievance against Ms. Ward relating to Dallas ISD's investigations into the students' accusations. Doc. No. 51-2 at 22, ¶61. The District's Employee Relations department reviewed Mr. Bravo's Level I Grievance and on June 8, 2022, notified Mr. Bravo that his grievance would be closed, since, as a matter of policy, grievances by employees on leave were closed, without prejudice to their being reopened upon the employee's return to active status. *Id.* In addition, since Mr. Bravo's grievance challenged his recommended termination, Dallas ISD believed the proper venue for further review of the LRC's recommendation would be a hearing before an independent examiner, as provided for by the Texas Education Code at §21.251, if requested by Mr. Bravo, rather than Dallas ISD's internal grievance process for active employees which Mr. Bravo sought to utilize. *Id* at 22-23, ¶¶62-66.

On May 30, 2022, Mr. Bravo also filed a separate DIA Complaint, which alleged he had been discriminated against based on race, age, sex, national origin and as for retaliation for a prior complaint. *Id.,* ¶67. While Mr. Bravo's DIA Complaint was pending, Dallas ISD held Mr. Bravo's final termination notice, and maintained him on administrative leave, pending the DIA Complaint's resolution. *Id.* at 21-25, ¶¶60,73. Dallas ISD's Office of Legal Services conducted an initial assessment of Mr. Bravo's

DIA Complaint and determined his complaint did not warrant further investigation, and his termination could proceed. *Id.* at 24-25, ¶70. However, due to a staffing shortage and the District's summer holiday for many staff, Mr. Bravo's termination letter was not sent until August 2, 2022. *Id.* at 25, ¶¶73,75.

Mr. Bravo's termination letter stated that Dallas ISD's completed investigation had concluded Mr. Bravo had violated District standards of conduct and District policy, and he was being terminated for (1) failure to comply with District policies, (2) failure to meet the District's standards of conduct, and (3) for his conduct which adversely affected the District. Doc. No. 51-3 at 59-61. After receiving his termination letter, on August 9, 2022, Mr. Bravo requested an independent hearing examiner be appointed under Chapter 21, and a hearing examiner was duly appointed. Doc. No. 51-2 at 26, ¶78.

Separately, on August 1, 2022, Mr. Bravo began employment as a teacher with the Grand Prairie Independent School District ("Grand Prairie ISD"). Doc. No. 51-8 at 63, 251:13-21. However, Mr. Bravo's tenure at Grand Prairie was short lived, and he soon resigned from Grand Prairie ISD, citing health issues. Doc. No. 51-8 at 65, 257:18-25.

In September 2022, Dallas ISD became aware of Mr. Bravo's employment with Grand Prairie ISD. *Id.* at ¶79. After learning this, Dallas ISD moved to dismiss Mr. Bravo's independent hearing proceedings as moot, on the basis that by accepting new employment, Mr. Bravo had constructively resigned and abandoned his challenge to

his termination. *Id.* at 27, ¶80. On September 28, 2022, without making any findings of fact, the independent hearing examiner granted Dallas ISD's motion and dismissed Mr. Bravo's Ch. 21 hearing as moot. *Id.* at 27, ¶¶80. After Mr. Bravo's hearing was dismissed, Dallas ISD concluded that Mr. Bravo had resigned and stopped paying his salary. *Id.* at 27, ¶¶81.

On October 12, 2022, Mr. Bravo appealed the decision of the independent hearing examiner and his final termination by Dallas ISD to the Texas Education Commissioner pursuant to TEX. EDUC. CODE § 21.301. *Id.* at 27-28, ¶82. On December 5, 2022, the Commissioner ruled that the independent hearing examiner was in error to dismiss Mr. Bravo's hearing as moot, and further found that Mr. Bravo had not constructively resigned by taking other employment. *Id.* Since the Board had not voted to terminate Bravo's employment contract before the school year began, and the Commissioner had ruled that Mr. Bravo had not resigned, Mr. Bravo's contract remained in effect. *Id.*

After weighing the costs of further pursuing Mr. Bravo's termination, on February 24, 2023, Dallas ISD reinstated Mr. Bravo, paid Mr. Bravo back pay for approximately five months of unpaid salary and transferred him to teach at a different middle school. *Id.* at 28, ¶¶83-84. Mr. Bravo then returned to active teaching, but on March 7, 2023, left on approved medical leave that was granted until February 7, 2024. *Id.* at 29, ¶86. After Mr. Bravo's medical leave expired, he was unable to return to work and his employment with Dallas ISD ended. *Id.*

After duly filing a charge of discrimination with the EEOC and receiving a right to sue letter, Mr. Bravo timely filed his Original Complaint in this Court on July 18, 2023, and later his First Amended Complaint, to bring a claim of unlawful discrimination under Title VII of the Civil Rights Act of 1964 on the basis of disparate treatment he suffered because of his race, ethnicity and national origin in Dallas ISD's relating to the District's handling of the investigation of the students complaints and its decision to pursue Mr. Bravo's termination.  Doc. No. 1; Doc. No. 7

## II.    STANDARD OF REVIEW

A district court shall grant summary judgment when the record shows there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v Catrett*, 477 U.S. 317, 323-25 (1986) (citing FED. R. CIV. P. 56(a)).  A dispute regarding a material fact is "genuine… if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a moving party has made an initial showing that there is no evidence to support the non-moving party's case, the party opposing the motion must come forward with competent summary judgment evidence showing the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To defeat a motion for summary judgment, a non-movant must establish the presence of a genuine material factual dispute by showing there is an actual factual controversy, based on more than a scintilla of evidence, and not simply metaphysical

doubt as to the material facts, conclusory allegations, or unsubstantiated assertions. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "Conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the non-movant's burden in a motion for summary judgment. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

To assert a "genuine dispute of material fact" a non-movant must cite "to particular parts of material in the record" or show that the materials cited by the movant do not establish the absence of a genuine dispute. *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 74 F.4th 268, 275 (5th Cir. 2023)(citing FED. R. CIV. P. 56(c)). Since a district court has no duty to "sift through the record," evidence in the summary judgment record which the non-movant "fails to even refer to in their response to the motion for summary judgment… is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)(quotations omitted).

"We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, F.3d at 1075. "We will not assume in the absence of any proof … that the nonmoving party could or would prove the necessary facts and will grant summary judgment in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005)(quotations omitted)(emphasis in original).

III.    ANALYSIS

A. Title VII of the Civil Rights Act of 1964

Title VII of the Civil Rights Act of 1964 makes it an unlawful practice for an employer to "fail or refuse to hire or discharge any individual, or otherwise… discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individuals' race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).    "To plead a disparate treatment discrimination claim under Title VII, a plaintiff must allege acts plausibly showing '(1) an adverse employment action, (2) taken against a plaintiff because of her protected status." *Hamilton v. Dall. Cnty.*, 42 F.4th 494, 502 (5th Cir. 2022). When a Title VII claim for disparate treatment is brought on the basis of circumstantial evidence, it is subject to the familiar *McDonnell Douglas* three-step burden shifting analysis.  *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

To survive summary judgment under *McDonnell Douglas*, the "plaintiff asserting Title VII claims must first establish a *prima facie* case, 'which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group.'" *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 429 (5th Cir. 2023) (quoting *McCoy v.*

12

*City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).  "If the plaintiff presents a *prima facie* case, discrimination is presumed." *Davis,* 383 F.3d at 317.

Though the Supreme Court has instructed that *McDonnell Douglas* analysis was not intended to be "rigid, mechanized, or ritualistic," in the Fifth Circuit, when a circumstantial discrimination complaint is challenged at summary judgment, the plaintiff must always first meet its burden to establish a *prima facie* case before the district court may properly consider the second and third steps of the burden shifting analysis. *U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *but see, e.g., Stallworth v. Singing River Health Sys.*, 469 F. App'x 369, 372 (5th Cir. 2012); *Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 334–35 (5th Cir. 2014); *Long v. City of Llano,* No. 24-50663, 2025 WL 655800, n.1 (5th Cir. Feb. 28, 2025)(per curiam) (each distinguishing *Aikens* and holding that at summary judgment, the plaintiff must always establish a *prima facie* case). This is true even when the parties produce evidence to address the second and third steps of the analysis. *See Hague*, 560 F. App'x 334-35 ("There is no authority in this Circuit that would allow the employee's burden of establishing a *prima facie* case to be extinguished simply because an employer exercises its rights to challenge the prima facie case and also proffers a legitimate, nondiscriminatory reason for its decision.")

At the second step of *McDonnell Douglas*, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action." *Davis*, 383 F.3d at 317.  "If the employer is able to state a legitimate rationale

13

for its employment action," then "the inference of discrimination disappears." *Id.* The defendant's burden to produce a non-discriminatory reason "is one of production, not persuasion… and can involve no credibility assessment." *Rios v. Rossotti,* 252 F.3d 375, 379(5th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000)).

At the third step of *McDonnell Douglas*, to survive summary judgment, "the plaintiff must present substantial evidence that the employer's proffered reason was mere pretext for racial discrimination." *Outley v Luke & Assocs., Inc.,* 840 F. 3d 212, 218 (5th Cir. 2016) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "A plaintiff may establish pretext either through (1) evidence of disparate treatment or (2) by showing that the employer's proffered explanation is false or unworthy of credence." *Id.*

"To establish disparate treatment, a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507 (5th Cir. 2001)(quotations omitted). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment determined by the same person, and have essentially the same comparable violation histories." *Lee v. Kansas City S. Ry. Co.*, 574

14

F.3d 253, 260 (5th Cir. 2009)(quotations omitted).  "Critically, the plaintiff's conduct that drew the adverse employment action must have been nearly identical to that of the proffered comparators who allegedly drew dissimilar employment decisions." *Id.*

On the other hand, "evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient," and "an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief." *Auguster v. Vermillion Parish School Bd.*, 249 F. 3d 400, 403 (5th Cir. 2001)(quoting *Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)).  In a case where an employee suffers an adverse employment event following a third party's accusation, the employee's "guilt or innocence… is largely irrelevant," because the "ultimate falseness of the complaint proves noting as to the employer, but only to the complaining [party]."  *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993).  "The real issue is whether the employer reasonably believed the [complaining party's] allegation and acted on it on good faith, or to the contrary, the employer did not actually believe the [complaining party's] allegation but instead used it as a pre-text for an otherwise discriminatory dismissal." *Id.*  "Thus, the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Id.*

## B. Analysis of Mr. Bravo's Title VII Claim

In his First Amended Complaint, Mr. Bravo asserts that Dallas ISD engaged in

"unlawful employment practices in violation of Title VII... as a result of Mr. Bravo's race, ethnicity and/or national origin as a Hispanic individual of Mexican American ancestry." Doc. No. 7 at 12-13, ¶33. Mr. Bravo further asserts that Ms. Ward, Quintanilla's Principal, who he alleged "had asserted antagonism toward non-African American employees, concocted false allegations against [him] or prompted others to do so." *Id.* He further complained "the school district repeatedly undermined and impeded [his] efforts to defend himself," "stopped paying his salary," "ignored [his] internal administration grievances and discrimination complaints," and "made reports to [State of Texas'] Child Protective Services and to the Texas State Board of Education Certification without vetting them internally." *Id.* He complains this "discriminatory conduct" led him to suffer lost wages, lost growth opportunities, lost interest, and past and future physical and mental anguish. *Id*. at 13, ¶34.

In its Motion for Summary Judgment and the Parties' subsequent briefing, Dallas ISD asserts that Mr. Bravo (1) abandoned his claims relating to being put on administrative leave or, reported to the CPS and SBEC; and relating to his remaining claims relating to Dallas ISD's investigation of the students' complaints and resulting attempt to terminate his employment; (2) failed to cite evidence to establish a *prima facie* case of disparate treatment, as required by *McDonnell Douglas*; (3) that Dallas ISD produced a legitimate nondiscriminatory reason for its actions and Mr. Bravo fails cite evidence to establish a genuine material dispute of fact that Dallas ISD's reason was pre-text for unlawful discrimination; and finally (4) Mr. Bravo fails to cite any evidence

in support of the serious and specific accusations which he made in his complaint. The Court considers each argument in turn.

### 1. Mr. Bravo abandons his claims relating to being put on administrative leave and reported to the CPS and SBEC

In its Motion for Summary Judgment, Dallas ISD asserts that Mr. Bravo fails to establish a genuine dispute of material fact relating to any claims relating to being put on administrative leave and reported to the CPS and the SBEC. Specifically, Dallas ISD cites to Mr. Bravo's deposition, in which he acknowledges that he does not contend the district's decision to put him on administrative leave was due to race, national origin, or ethnicity. Doc. No. 51-8 at 45, 177:11-20. Mr. Bravo also testified that he has no evidence that the district's reports filed with the CPS were based on his race, ethnicity or national origin. *Id*. at 48, 191:10-21. Mr. Bravo also testified he did not claim that the district's report filed with the SBEC was based on his race, ethnicity or national origin. *Id*. at 62, 245:5-9. In his Response, Mr. Bravo confirmed that he "does not challenge" his being put on administrative leave, the allegations being reported to third party state agencies, or that an investigation was opened into the allegations against him, which, he concedes, were "plainly serious and merited inquiry." Doc. No. 58 at 6. Accordingly, the Court finds Mr. Bravo has abandoned his claims relating to being put on administrative leave and reported to the CPS and the SBEC.

### 2. Mr. Bravo fails to cite evidence to establish all elements of his *prima facie* Title VII claim for disparate treatment

After careful review of the Parties' substantial briefs and extensive evidence, the

Court finds Mr. Bravo fails to establish all elements of his required *prima facie* case, because he fails to cite any evidence of the fourth element of the required *McDonnell Douglas* analysis and, thus, fails to establish a *prima facie* disparate treatment claim. Since Mr. Bravo fails to cite to evidence to establish a genuine dispute of material fact on all required elements of his Title VII claim, the Court must grant summary judgment for Dallas ISD on Mr. Bravo's Title VII claim.

To establish a prima facie case of discrimination, Mr. Bravo must show that he was (1) a member of a protected group; (2) qualified for his position; (3) discharged or suffered some adverse employment action; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. *See Brookhaven Sch. Dist.*, 82 F.4th at 429.

In its Motion for Summary Judgment, Dallas ISD asserts that Mr. Bravo fails to cite any evidence of a more favorably treated similarly situated comparator, and thus Mr. Bravo fails to establish a *prima facie* case and thus, fails to cite to evidence to establish all elements required for his claim for relief.  Doc. No. 50 at 27.

A plaintiff must establish each element of its prima facie case of disparate treatment under *McDonnell Douglas*, and the plaintiff properly establishing evidence of a comparator is fundamental to making its claim. This is because a plaintiff who cites evidence showing similarly situated out of group comparators were treated more favorably will establish the presumption that the treatment suffered was due to the plaintiff's membership in a protected group.  *Davis*, 383 F.3d at 317.  On the other

18

hand, if the plaintiff fails to provide any evidence of a similarly situated comparator who was more favorably treated, the plaintiff, in effect, fails to offer any evidence that the suffered treatment, was disparate at all. That is the case which presents itself here.

In particular, Mr. Bravo *concedes* in his Response that "because of the unique nature of the student accusations, Plaintiff is unaware of a comparator similarly accused by students of making racially charged remarks during classroom instruction." Doc. No. 58 at 38, n.186. Thus, Mr. Bravo admits that he has no evidence of any comparator required to establish a *prima facie* claim. Thus, Mr. Bravo admits that he has failed to establish a genuine dispute of material fact relating all required elements of his claim, and thus no trial is needed to resolve Mr. Bravo's claim.

To attempt to get the Court to disregard his failure to offer any evidence of a similarly situated comparator, Mr. Bravo cites to the Supreme Court in *Aikens* for the general proposition that the *McDonnell Douglas* analysis was "never intended to be rigid, mechanized or ritualistic," however, the Fifth Circuit has distinguished *Aikens* as applying to post-trial review, and consistently held that at summary judgment a plaintiff alleging disparate treatment based on circumstantial evidence must make a *prima facie* case. 460 U.S. at 715; *but see Hague*, 560 F. App'x 334-35. Accordingly, Mr. Bravo's admission that he cannot establish a *prima facie* case is fatal to his claim.

Further, Mr. Bravo's deposition testimony, cited and offered into the summary judgment record by Dallas ISD, establishes that Mr. Bravo does not have any knowledge or evidence of any similarly situated comparator being treated differently in

nearly identical circumstances, and as such, he concedes he cannot establish a genuine dispute of material fact on a necessary element of the claim. Doc. No. 50 at 35.

In reviewing the cited evidence, the Court first notes Mr. Bravo testified that he does *not* claim that Dallas ISD treated any person of other race, ethnicity, or national more favorably than him under similar circumstances. Specifically, he testified:

Q.   Do you claim that Dallas ISD treated any person of a different race more favorably than you under similar circumstances?

A.   Well, similar circumstances relating to the student statements? No.

Q.   You don't have knowledge of anyone else for against whom a student complained that they made inappropriate comments in class and their case was handled differently; correct?

A.   Correct.

Q.   Do you have any knowledge of any of Dallas ISD treating any person of a different race more favorably than you in terms of who was accused of any employee misconduct?

A.   No.

Q.   Okay. Do you have – do you have – do you claim that Dallas ISD treated any person of a different ethnicity more favorably than you under similar circumstances?

A.   No.

Q.   Do you claim that Dallas ISD treated any person of a different national origin more favorably than you under similar circumstances?

A.   No.

Doc No. 51-8 at 71-72; 286:14-285:12.  In this testimony, Mr. Bravo disclaims that he believes Dallas ISD caused him to suffer any disparate treatment due to his race, ethnicity or national origin.  In effect, Mr. Bravo disclaims his Title VII claim.

Consistent with this disclaimed disparate treatment due to his protected classes, Mr. Bravo also testified that he did not have any knowledge of his school's Principal, Ms. Ward, handling any other investigation or any other recommendation about employment differently than for any other employee. *Id.* at 58, 229:8-12. Mr. Bravo also conceded he did not have any reason to believe Ms. Ward specifically handled his situation differently than that of any other employee in a similar situation. Doc. No. 51-8 at 69, 273:19-23. Mr. Bravo also conceded he didn't have any knowledge of how any other investigation of any employee misconduct had ever been handled by Ms. Ward or anyone else at PSO or Dallas ISD; and conceded that therefore he can't say his investigation was handled differently than for anyone else's of a different race, ethnicity, or national origin. *Id.*, 275:9-20.

In addition, Mr. Bravo conceded that he didn't have any evidence that the District's decision making LRC ever handled another person's case of a different race, ethnicity, or national origin than his differently. *Id.*, 276:17-11. Mr. Bravo also testified he was not aware of the LRC's review of any other matters, did not know how they review student statements, or anything else, and conceded that his belief the LRC's determination regarding his employment was due to his race or ethnicity was speculation. *Id.* at 59-60, 236:10-237:3.

Finally, Mr. Bravo also conceded he did not have any evidence or information that his grievances or complaints were handled differently than anyone else's of a different race, ethnicity or national origin; and he conceded that his personal belief that

his race, ethnicity and national origin influenced their handling was just speculation. *Id*. at 69-70, 276:21-277:4. Of course, this speculation, and the others noted above, are not proper summary judgment evidence. *See Little*, 37 F.3d at 1075.

Since the summary judgment record establishes that Mr. Bravo has cited no evidence of any similarly situated comparator that was more favorably treated in nearly identical circumstances, he has failed to establish his treatment was disparate, and he fails to establish a *prima facie* Title VII disparate treatment claim. By failing to cite to evidence necessary to establish a required element of his Title VII claim, Mr. Bravo fails to establish a genuine dispute of material fact, and the Court must grant summary judgment for Dallas ISD on Mr. Bravo's Title VII claim.

> **3. Mr. Bravo fails to present substantial evidence Dallas ISD's proffered legitimate nondiscriminatory reason was pre-text for racial discrimination, since he concedes the LRC believed the students' accusations he had violated school policy**

Although the Parties and the Court need not address either the second or third step of *McDonnell Douglas* given that Mr. Bravo failed to meet his burden to produce a *prima facie* case in the first, in light of the Parties' lengthy briefs and extensive litigation, the Court considered Mr. Bravo's evidence of pre-text and also finds Mr. Bravo failed establish, with the "substantial evidence" required, that Dallas ISD's proffered legitimate nondiscriminatory reason for the actions they took regarding his employment was mere pretext for racial discrimination. *See Outley,* 840 F. 3d at 218.

As discussed extensively *supra*, the parties agree on the basic facts of the case.

Namely, Mr. Bravo was accused by six students of making allegedly inappropriate statements in class. The school completed an investigation and after reviewing the investigation report, considering Mr. Bravo's statement, and the statements from the students themselves, Dallas ISD determined Mr. Bravo had violated the district's policies, and determined he should be terminated for good cause.   Although a defendant need not produce any reason if the plaintiff fails to plead a *prima facie* case, Dallas ISD identified its investigation of the students' accusations and its resulting determination that Mr. Bravo had violated its policies, as the legitimate nondiscriminatory reason for its decision to pursue Mr. Bravo's termination.

In considering the evidence Mr. Bravo offered to attempt to establish pretext, although Mr. Bravo spends substantial effort explaining his innocence, that is not a focus for the Court.  Though the Court does not doubt Mr. Bravo sincerely believes he did not make any inappropriate statements, the Court need not determine whether he did or didn't make these statements, since Mr. Bravo's "guilt or innocence…" when assessing pre-text "is largely irrelevant." *Waggoner*, 987 F.2d at 1165.  Rather, "the real issue is whether [Dallas ISD] reasonably believed the [students'] allegation and acted on it on good faith, or to the contrary, the employer did not actually believe the [students'] allegation but instead used it as a pre-text for an otherwise discriminatory dismissal." *Id.*  Given this, evidence of pretext must establish that Dallas ISD did not believe the students' accusations, or that they acted on them in bad faith.  On the facts in the summary judgment record, this is something Mr. Bravo fails to do.

23

First, on this record, it shows it substantial uncontroverted testimony establishes that that Dallas ISD believed the students' statements.  Simply put, numerous Dallas ISD staff indicated they believed the students statements, and Mr. Bravo offers no evidence to controvert this.  Specifically, Mr. Minor, the first teacher to speak with any complaining students, stated he believed the students were being truthful, and based on his experience as these students' teacher, he did not believe these students would make things up. Doc. No. 51-1 at 2-3, ¶¶5,7.  Mr. Ceballos, the second Dallas ISD employee to speak with the students, also believed, based on his communication with and observations of the students, that he believed the students were credible and truthfully conveying their personal experience. Doc. No. 51-5 at 4-5, ¶17.

In her meeting with Mr. Bravo, Ms. Ward then concluded that Mr. Bravo's statements to her corroborated the general nature of what the students had reported. Doc. No. 51-6 at 5, ¶15.  Ultimately, Ms. Ward's investigative report concluded the accusations, and the corresponding policy violations, were substantiated, since the six students' statements were consistent, and this consistency weighed in favor of their credibility, even though the statements were denied by Mr. Bravo.  *Id.* at 13, ¶38. Finally, Mr. Abel, the Dallas ISD Chief of Human Capital, and a member of the LRC, states that the LRC "believed the students" and "believed they were sufficient to find that Mr. Bravo violated Standard 3.2 of the Educators' Code of Ethics."  Doc. No. 51-2 at 16,  ¶¶44-46.

Based on the students' statements and the violation of district policy by Mr.

24

Bravo which they evidenced, Ms. Ward recommended to Dallas ISD that Mr. Bravo's contract be non-renewed.  Doc. No. 51-6 at 14, ¶42. After reviewing the statements and the investigative report, and Ms. Ward's recommendation to non-renew Mr. Bravo's contract, the LRC determined his conduct was good cause for termination and unanimously voted to recommend Mr. Bravo's termination.  Doc. No. 51-2 at 17-18, ¶¶47-50.

Thus, Dallas ISD cites to evidence that it believed the students' accusations, and after investigating in good faith, determined that Mr. Bravo's violations of policy properly required his termination for good cause.  Mr. Bravo fails to controvert this evidence, and rather, fails to cite any evidence to establish a genuine dispute of material fact that Dallas ISD did not believe the students' statements or relied on them in bad faith.  Further, relating to the "real issue", whether the District believed and acted on the students statements, Mr. Bravo himself concedes, rather than controverts, the evidence presented by the Dallas ISD.

In fact, rather incredulously, although in his First Amended Complaint Mr. Bravo specifically asserted that Ms. Ward orchestrated false allegations against him, in his deposition, he concedes he has no evidence that the Ms. Ward did not believe the student statements. *Id.* at 41, 162:24-164:2; *see also Id.* at 54, 215:18-216:21.  Rather, Mr. Bravo testified only that she "would have been knowledgeable of my character and my demeanor and the way I carried myself and know that I was not capable of making those types of statements." *Id*. at 41, 162:12-23.  However, Mr. Bravo concedes this

25

belief in what she would have known is merely speculation. *Id.* at 41, 162:12-13.

Mr. Bravo also testified he had no evidence that Mr. Ceballos, who spoke with the students and collected their statements, did not believe the students statements. *Id.* at 54-55, 216:22-217:9. He also conceded his belief Mr. Ceballos thought the statements were false was just his speculation. *Id.*

Finally, Mr. Bravo testified several times that he believed that the LRC believed the student statements. Doc. No. 51-8 at 53, 210:4-13, 210:23-211:1; *Id.* at 59, 234:5-235:23. In addition, Mr. Bravo testified that the LRC acted on the students' statements. *Id.* at 59, 234:5-235:23. Finally, Mr. Bravo also admitted that the statements attributed to him were "inappropriate" and "would be violations" of the district's standards. *Id.* at 32, 128:1-9.

Thus, Mr. Bravo's own testimony concedes that the LRC believed the students statements, the statements would have been violations of District policy, and thus the Dallas ISD had good cause to terminate him for the violation of policy which they believed had occurred, which, of course, is what they did. Therefore, Mr. Bravo essentially admits that he cannot establish pretext in these circumstances. *See Waggoner,* 987 F.2d at 1165; *Outley,* 840 F.3d at 218.

Therefore, in light of Mr. Bravo's own admissions, which corroborate rather than controvert Dallas ISD's evidence that shows the District believed the students' accusations and acted on them in good faith, the Court finds Mr. Bravo fails to cite to substantial evidence to show his termination was a result of pretext, to establish a

genuine dispute of material fact on the question of pretext. Thus, even if Mr. Bravo had pled a *prima facie* claim, Mr. Bravo's evidence would still fail to create a factual matter necessary for a trial to resolve. Accordingly, for this additional reason, the Court must grant summary judgment for Dallas ISD on Mr. Bravo's Title VII claim.

> **4. Finally, Mr. Bravo fails to support his allegations against Ms. Ward of discriminatory animus with any proper evidence.**

In his First Amended Complaint, Mr. Bravo specifically complained that Ms. Ward's alleged "antagonism towards non-African American employees" led Ms. Ward to "concoct false allegations against [Mr.] Bravo or prompt others to do so." Doc. No. 7 at 12, ¶33. This is a serious and specific allegation, which Mr. Bravo's briefing shows he has abandoned. Specifically, Mr. Bravo's Response, narrows his allegation, to merely assert that Ms. Ward had discriminatory animus against non-African Americans, which, he alleges, in unspecified ways, improperly influenced Dallas ISD's investigation and the LRC's recommendation to terminate him for good cause. Either way, Mr. Bravo fails to support his allegations against Ms. Ward with proper evidence.

First considering the specific allegations he raised in his First Amended Complaint, which specifically alleged Ms. Ward was somehow responsible for the students' false statements, Mr. Bravo testified at his deposition that *he did not have any reason* to believe Ms. Ward did anything to make students come forward with statements about him. *Id*. at 40, 160:15-18. Consistent with this, Mr. Bravo further testified that he had no evidence that Ms. Ward spoke with any of the students who

made these statements, either before or after they gave their statements to the school. Doc. No. 7 at 12, ¶33; *Id*. at 40, 157:18-160:14.  In addition, Mr. Bravo testified that he had no reason to believe Ms. Ward knew about the students before Mr. Ceballos took their statements and admitted that his belief that she did was just speculation. *Id.* at 35-36, 140-142.  Similarly, Mr. Bravo conceded that he had no reason to believe Ms. Ward communicated with Mr. Minor before Mr. Minor brought the students forward, although he speculated that she did.  *Id.* at 34, 133:17-135:17.  Though the Court does not weigh competing evidence at summary judgment, Mr. Bravo himself concedes he has nothing but his speculation to support the specific and serious accusations he raised against Ms. Ward in his First Amended Complaint.

In addition, Mr. Bravo cites no relevant evidence to establish Ms. Ward's discriminatory animus against him, to which he attempts to attribute Dallas ISD's actions against him under a cats-paw theory of Title VII liability.

Critically, in his deposition Mr. Bravo concedes that he has no evidence that Ms. Ward had any discriminatory animus either towards either him or anyone else. Specifically, Mr. Bravo conceded in his deposition that he had never heard Ms. Ward make a biased statement about him or anyone else, and had he never had anyone else report to him that they had heard Ms. Ward make a biased statement about him or anyone else.  Doc. No. 51-8 at 47, 185:17-186:6.  In addition, Mr. Bravo admitted that he had never heard from anyone, or seen any documentation to show that Ms. Ward wanted to remove him, never heard from anyone else that Ms. Ward said

anything negative about him and testified that he had no knowledge that Ms. Ward had ever expressed any animosity about him. *Id.* at 36, 142:19-143:7. Finally, Mr. Bravo conceded his belief that Ms. Ward wanted to remove him was only speculation. *Id.* at 34, 136:3-9. In light of Mr. Bravo's clear admissions about his lack of evidence of Ms. Ward's discriminatory animus or discriminatory acts, and the lack of relevance of the other unrelated evidence he introduces to attempt to suggest an appearance of animus discussed *infra*, Mr. Bravo fails to establish the discriminatory animus of Ms. Ward, which is a necessary element of his cats-paw theory.

Finally, the Court notes that after the Dallas ISD's submitted its Motion for Summary Judgment, to buttress his attempt to establish a genuine dispute of material fact relating to failure to evidence his disparate treatment claim, Mr. Bravo obtained affidavits from other former employees, filed an unrelated Dallas ISD investigative report under seal with the Court, and submitted an affidavit from Mr. Bravo presenting Dallas ISD statistics, with nearly five hundred pages of data in support. Doc. No. 59-2; Doc 59-1 at 459-513. Although the Dallas ISD challenged each of these items on various bases, the Court reviewed this evidence and found it related only generally to the Quintanilla Middle School and was not relevant to Mr. Bravo's specific disparate treatment claim. Specifically, the Court found that this evidence did not establish evidence of any similarly situated employees more favorably treated in nearly identical circumstances to Mr. Bravo, nor did any of this evidence establish that Ms. Ward either held a discriminatory animus towards Mr. Bravo, or evidence any of the specific

discriminatory acts by Ms. Ward which Mr. Bravo had earlier alleged. Thus, although the Court carefully considered this evidence, since it was not relevant to the Court's analysis of Mr. Bravo's disparate treatment claim, it did not influence the Court's ruling in this case.

Therefore, the record shows Mr. Bravo fails to establish his allegations that Ms. Ward had discriminatory animus, and in fact, in his deposition he essentially admits he has no evidence to support his central allegation, that he suffered due to Ms. Ward's discriminatory animus against him. Whether, if proven, Mr. Bravo's allegations based on Ms. Ward's alleged discriminatory animus might have been sufficient to entitle Mr. Bravo to relief either as pre-text under a cats-paw theory or by arguing a case of direct evidence of discrimination, the Court need not consider, for Mr. Bravo fails to cite evidence to support his allegations against her. Therefore, for this final reason, the Court must grant summary judgment for the Dallas ISD on Mr. Bravo's Title VII claim.

## C. Evidentiary Objections and Motion to Strike

After careful consideration of Mr. Bravo's Objections, Dallas ISD's Response, and the Court's careful review of the record and the applicable law, the Court finds the evidence Mr. Bravo challenges is properly admitted, and his objections are overruled.

After careful consideration of Dallas ISD's Objections and Motion to Strike, and Mr. Bravo's Response, and the Court's careful review of the record and the applicable law, the Court finds the evidence Dallas ISD's Objections challenges is properly admitted, and its objections are overruled. Further, in light of the Court's grant of the

Motion for Summary Judgment for Dallas ISD, the Motion to Strike is denied as moot.

## IV.    CONCLUSION

After careful consideration of the Motion for Summary Judgment, the Parties' briefs, the applicable law and the summary judgment record before the Court, the Court finds that Mr. Bravo has failed to establish a genuine dispute of material fact for all required elements of a *prima facie* claim of disparate treatment under Title VII of the Civil Rights Act of 1964.  Accordingly, Dallas ISD's Motion for Summary Judgment is GRANTED.  Dallas ISD's and Mr. Bravo's Objections are both OVERRULED, and Dallas ISD's Motion to Strike is DISMISSED as moot. A final judgment will enter separately.

**SO ORDERED.**

Signed July 30th, 2025.


_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE